IN THE TAX COURT OF THE
STATE OF OREGON

PIEDMONT PLAZA INVESTORS
*v.*
DEPARTMENT OF REVENUE
(TC 4123)

SPENCER HOUSE ASSOCIATES
*v.*
DEPARTMENT OF REVENUE
*and*
WASHINGTON COUNTY ASSESSOR,
*Intervenor*
(TC 4124)

W. Scott Phinney, Lake Oswego, represented Plaintiffs (taxpayers).

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented Defendant (department).

Washington County intervened in Tax Court Case No. 4124 but did not appear at trial.

Decision for Defendant rendered December 29, 1998.

**CARL N. BYERS, Judge.**

Plaintiffs appeal the 1994-95 and 1995-96 assessed values of their low-income apartment properties. The properties are operated under a Department of Housing and Urban Development (HUD) program. Through agreements with the owners, the government exercises significant control over the properties in exchange for the owners receiving significant benefits. Oregon law requires that these properties be assessed at their real market value, taking into consideration any effect the governmental restrictions may have on value. ORS 308.205(2)(d).[1] These cases focus on how to measure the effects of those restrictions on real market value.

*Low-Income Housing Legislation*

The subject properties fall under Section 236 of the National Housing Act (Public Law 90-448, 12 USC 1713), one of many federal housing programs. This program, "active" between 1968 and 1973, created incentives for private citizens to provide residential properties for low-income families. Under this program, HUD accepted applicant-constructed apartment projects subject to 40-year mortgages that could not be prepaid during the first 20 years. Prepayment was restricted to insure that the properties remained in the program for at least 20 years. Because HUD insured payment of the mortgage, only a minimal down payment of 3 to 7 percent was required. In addition, HUD subsidized the monthly loan payments by paying all of the interest except

---

[1] All references to the Oregon Revised Statutes are to 1993.

1 percent. Thus, the owner's monthly payments were calculated as if the loan bore only a 1 percent interest rate. In addition to these major incentives there were builders fees, management fees, and income tax incentives.

In exchange, HUD exercises extensive control over the projects, limiting the amount of rent that can be charged, restricting the cash that the owner can withdraw, requiring reserves for replacements and repairs, and exercising management control in other ways. These restrictions continue until the initial mortgage is paid. Nevertheless, the incentives motivated a number of private parties to construct and operate Section 236 projects.

As the mortgage(s) on many Section 236 projects neared their 20-year mark, concern arose that the owners would exercise their right to prepay them, thereby removing the restrictions and, in turn, the properties from the low-income market. Fearing that this would diminish the supply of affordable housing, in 1987, Congress enacted emergency restrictions further limiting the right to prepayment. In 1990, these temporary measures were replaced by permanent restrictions in the form of the Low-Income Housing Preservation and Resident Homeownership Act (LIHPRHA or Preservation Act).[2] The basic objective of the Preservation Act was to ensure that most of the " 'prepayment' inventory remain[ed] affordable to low-income households * * * while at the same time fairly compensating owners for the value of their properties."

Although the Preservation Act imposed new conditions on the owner's right to prepay the mortgage, the owner retained the right to continue operating the property under Section 236 restrictions until the 40-year mortgage matured. Also, an owner could sell the property on condition that the property continue to be subject to Section 236 restrictions. Inasmuch as these two alternatives contemplated an additional 20 years of governmental restrictions, no one suggests that they are economic alternatives.

To preserve low-income affordable housing, the Preservation Act provides three alternatives for owners of

---

[2] It is also known as Title 6 of the National Affordable Housing Act of 1990.

Section 236 projects. First, the owner can prepay the mortgage. However, that alternative is available only if HUD determines that: (a) there is an adequate supply of low-income housing in the locality; (b) prepayment of the mortgage will not otherwise undermine public policy, and (c) prepayment will not materially increase economic hardship on the current tenants. The testimony indicated that most properties would be unable to meet these conditions.

In the absence of meeting the conditions for the first alternative, the Preservation Act provided two other alternatives "with incentives."[3] One alternative extends HUD restrictions for the remaining useful life of the property in exchange for the owner receiving an 8 percent annual return on the value of the owner's equity. The final alternative allows the owner to transfer the property to a qualified purchaser, in effect selling the owner's equity to a purchaser that accepts HUD restrictions for the remaining useful life of the property.

*The Preservation Process*

The preservation process is initiated by the owner giving notice to HUD of intent to prepay, extend or transfer the owner's interest. Based on that notice, if the owner elects to extend or transfer, then the owner and HUD each have the property appraised by an independent appraiser. Each appraisal establishes two values: (1) an extension value, which is the fair-market value of the property assuming that its highest and best use is for residential rental housing; and (2) a transfer value, which is the fair-market value of the property at its actual highest and best use.

The overview of HUD's appraisal guidelines states:

"In the case of an owner seeking to retain a project, the basis of any incentive is an appraisal of a project's extension preservation value, i.e., its fair market value as unsubsidized market rate multifamily rental housing reflecting all repair and conversion costs needed to achieve the net income used in the analysis.

---

[3] The law expressly states that incentives can only be paid where the housing supply is inadequate.

"In the case of an owner seeking to sell a project, the maximum sales price will be the project's transfer preservation value, i.e., its fair market value at its highest and best use, reflecting all costs related to the conversion to its highest and best use.

"Thus both the extension and transfer preservation values measure the 'as-is' value of the property, rather than the potential value of the property fixed-up."

If the owner's appraised value exceeds HUD's appraised value by more than 5 percent, or the owner refuses to accept 105 percent of HUD's appraised value, then the owner and HUD jointly hire a third appraiser. The third appraiser's estimate of value, assuming no errors, is binding.

The values establish the property's overall value. When the mortgage balance is deducted, the remainder represents the value of the owner's equity. If the owner elected to extend the program for the remaining life of the property, then the owner is entitled to an 8 percent annual return on preservation extension value equity. In addition, the owner may obtain financing for capital improvements or even withdraw part of the equity. The program also allows the owner to charge increased rents to pay for the increased dividend and loan payments.

If the owner elects to transfer the property, then he will receive the preservation transfer value less the balance of the mortgage. Such properties may be sold only to "qualified purchasers." A council of residents organized to acquire the property of any nonprofit organization or agency is a "priority purchaser" and has the first right to purchase the property. If there is no priority purchaser, then any qualified purchaser, including a for-profit organization, can purchase the property. However, a qualified purchaser is required to maintain the low-income affordability restrictions for the remaining useful life of the property. For any preservation transfer, HUD can help with the purchase and, in fact, priority purchasers can obtain grants. If no sale or transfer occurs within 15 months, then the owner may voluntarily prepay the mortgage, but the property remains subject to a number of restrictions and conditions. *See* Sections 4113 and 4114.

*Valuation Issues*

ORS 308.250 requires real property to be assessed at 100 percent of its real market value. ORS 308.205(1) defines real market value as:

> "* * * the minimum amount in cash which could reasonably be expected by an informed seller acting without compulsion from an informed buyer acting without compulsion, in an arm's-length transaction during the fiscal year."

Subsection 2(d) provides:

> "If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, real market value shall not be based upon sales that reflect for the property a value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions."

The Department of Revenue (department) adopted an administrative rule, effective January 30, 1998, to clarify the valuation methods for government-restricted property. The rule, OAR 150-308.205(2)(d), provides that in valuing those properties, preservation sales can be used as comparable sales and the interest rate subsidy should be included as income in the income approach. The department asserts that its appraisals were prepared in accordance with the rule. Also, the department advised the county appraisers on how to perform the appraisals. Accordingly, before addressing specific valuation evidence, the court will discuss the two central issues raised by the rule. They are: (1) the appropriate treatment of the interest rate subsidy in the income approach; and (2) whether preservation transfer sales constitute comparable sales for the sales comparison approach.

*Interest Subsidy as Income*

As explained above, although the property owner signs a note with a lender for a market rate of interest, HUD pays the lender a monthly amount sufficient to reduce the owner's monthly payment to the equivalent of principal plus 1 percent interest. This enables the owner to charge lower rents. The department contends that in using the income approach, the amount of the subsidy must be included in

income because it is a benefit received by the owner. Plaintiffs contend that the subsidy is irrelevant because it is offset by the limited dividend and rent limitations.

■ Present value is the result of an anticipated stream of benefits, usually measured by cash flow. Appraisal Institute, *The Appraisal of Real Estate*, 18 (10th ed 1992). The cash flow that the owner of a Section 236 property can receive is a limited dividend in the amount of 6 percent of the *initial* investment. Both parties acknowledge that for the years in question, 6 percent was less than a market rate of return for equity. In addition, HUD's restrictions on rent limits the property's cash flow. As a result, the cash flow is frequently insufficient to pay even the 6 percent dividend. These restrictions, and others, have a significant negative impact on the present value of the property.

On the other hand, the interest subsidy is a benefit to the owner. To obtain ownership of the property, the owner(s) had to either contribute their own capital or borrow it from others. Borrowed money obviously must be repaid. To the extent that the interest subsidy helps an owner repay borrowed capital, the owner is obtaining a benefit. Whether the subsidy is paid to the owner or directly to the bank is immaterial, the end result is the same. Plaintiffs argue that because these loans are nonrecourse and are guaranteed by HUD, they benefit HUD, not the owners. In addition, they argue that if the rent restrictions were not in place they could charge higher rents and pay the full market interest without HUD's assistance. However, those characteristics do not change the economic consequences of the interest subsidy. The owner whose payments are subsidized by HUD receives a benefit by increasing the owner's equity.

■ In considering the effect of the interest subsidy on value, it must be noted that realization of the benefits from the subsidy are usually postponed. Although the subsidy increases the owner's equity, the owner may not be able to realize any benefit from that increase due to the restrictions. That delay in realization decreases the value of the benefit. For example, if an owner must wait 10 years before being able to realize any benefit, then the cost of the delay is real because the present value of $1 to be received 10 years in the

future, discounted at 10 percent, is only 38 cents (rounded). *See The Appraisal of Real Estate*, 704 (10th ed 1992).

Where a conventional property is financed by a conventional loan, the owner pays the interest and principal from the cash flow generated by the property. As the loan balance decreases, the owner's equity increases. The owner may realize on this increased equity by refinancing or by making other arrangements. Since HUD restrictions prevent an owner of a Section 236 project from realizing on the equity for a number of years, it has less value and thereby confers less benefit on the owner.

■ Therefore, when an appraiser considers the benefit derived by an owner from the interest subsidy, it may be necessary to perform a present value analysis of all of the restrictions and all of the benefits. In any case, it would be an error to simply include the interest subsidy as income in an income approach without adjusting for the effects of the restrictions on cash flow to the owner. It is also apparent that the element of management control, in and of itself, has value—particularly where that control is held by a government agency. Consequently, some adjustment or allowance must be made to reflect that fact. Because the rule does not make such adjustments, it is in error.

■ The department's witnesses appeared reluctant to acknowledge that many of the original incentives for Section 236 projects were not available to potential purchasers in 1994 and 1995. Some of these benefits, such as the low down payment and a builder's fee, were available only at the time of origin. Others are no longer obtainable because the law has changed. Those changes in the law may be likened to cases where property is rezoned to a more restricted and less valuable use after the owner constructed the property. The result is the same—a diminished market value. It does not matter whether the government is viewed as owning some of the rights of ownership or whether the government simply imposes restrictions that limit market value.

*Preservation Sales as Comparables*

The department contends that preservation transfers qualify as comparable sales for purposes of the sales comparison approach. Those transfers have particular appeal to the department because the properties remain subject to government restrictions after the transfer. In opposition, Plaintiffs contend that the preservation transfers are not free, open-market transactions. More importantly, they assert that transfer values are based on appraisals that assume that the property is free of Section 236 restrictions.

Both the federal statutes and HUD's appraisal guidelines make it abundantly clear that the preservation appraisal:

> "* * * shall assume repayment of the existing federally assisted mortgage, *termination of the existing low-income affordability restrictions*, simultaneous termination of any Federal rental assistance * * *." (Emphasis added.)

Hence, the preservation value does *not* represent the value of the property subject to restrictions. Also, preservation value is not the value of the property "as is" but the value of the property "as if" it were converted to a conventional market project. The appraiser must estimate the cost of improvements which the appraiser believes are necessary to make it a market competitive project:

> "These improvements can be characterized as hypothetical, with the exception of operational/energy upgrades, since they would be considered only for the purpose of estimating the Extension Preservation Value and would not in all likelihood occur." *Final Appraisal Guidelines*, 57 Fed Reg 19983 (1992).

The guidelines also state that:

> "The appraisal process establishes hypothetical preservation values. However, in actual fact, the property will be preserved for low-income occupancy under LIHPRHA."

The department's appraisers were unable to reconcile their position with the logic underlying comparable sales. That made it painfully clear that a preservation transfer is not a market transaction and is not good evidence of real

market value. For example, one of the "comparable sales" used by the department's appraisers, the preservation transfer of Fairview Arms, indicates a transfer value of $1,436,000. The buyer assumed an existing mortgage balance of $588,137.44, leaving the owner with a net (after closing costs) of $923,405.68. The buyer received a grant from HUD of $1,218,839 to assist it in "purchasing and rehabilitating the property." After transfer, the property remained subject to the Section 236 restrictions for its "remaining useful life." The documents indicate that the remaining life of the property is presumed to be greater than 50 years.

In essence, HUD purchased the owner's equity. HUD rules determined the price, the qualifications of the "buyer," the financing, and the applicable restrictions after the transfer. There was some evidence that negotiations do not even occur between the seller and the buyer, but between the seller and HUD. The price is not set by bargaining but by appraisals that assume the property is *not* subject to HUD restrictions. The court does not view such a transaction as a market sale.

The statutory value standard for assessment purposes is real market value. ORS 308.205.

> "Generally, market value is the cash price a property would bring in a competitive and open market." *IAAO, Property Appraisal and Assessment Administration*, 35 (1990).

The role of the federal government cannot be viewed as simply one of many open market forces. The Preservation Act was imposed on properties that had been subject to governmental restrictions for a number of years. It was the imminent expiration of those restrictions that motivated passage of the Preservation Act. But for the Preservation Act, those properties could have become unrestricted, open-market properties. As such, the preservation transfer is clearly not open market value and is not a comparable sale.

*Piedmont Plaza*

The court will now address specific appraisal evidence, considering first the valuation of Piedmont Plaza, a

68-unit garden court apartment complex in northeast Portland. It is comprised of 17 four-plexes, constructed as two-story wood-framed buildings, situated on one city block. It was constructed in 1975 as a Section 236 project with an initial mortgage of $1,139,600, bearing interest at 7 percent. Payment of the note was guaranteed by HUD and the interest is subsidized by HUD to the extent that the owners pay only the equivalent of a 1 percent interest rate. The project was sold in 1984 but continued under the HUD restrictions as required by the agreements.

The property's proximity to an industrial area, the below-average maintenance of surrounding properties, traffic, and crime problems make it less than a desirable neighborhood. The land is zoned high-density with one parking space per unit, which is less than market standard. The 2x4 wood-frame construction with T-111 siding, electric wall heaters, and modest bathrooms and kitchens was subject to some deferred maintenance.

Plaintiffs' appraiser, Skelte, found that the highest and best use of the property was "as is" due to its Section 236 restrictions. Due to the restrictions, he found that neither the cost approach nor the sales comparison approach were applicable. In addition, the restrictions and deferred maintenance would make a cost approach estimate less reliable, and because he did not consider the preservation transfers to be market transactions, he relied entirely upon the income approach.

Skelte recognized that the interest subsidy is a significant benefit, particularly when the market rate of interest in 1994 and 1995 was in the range of 9 to 9½ percent. However, he considered this benefit offset by the limited dividend and limited rent. Accordingly, he made no adjustment for the subsidy. Due to the Section 236 restrictions, Skelte used contract rent, rather than market rents, even though the contract rents were higher than market rents.[4] He estimated the vacancy rate to be 15 percent, based on a higher average historical rate but lower open market rate. His estimate of

---

[1] One wonders how "low-income," rent-regulated housing can have contract rents in excess of market rents without government programs working at cross purposes to each other.

expenses was higher than the market in many instances due to the additional paperwork for management and needed repairs.

For 1994, he estimated a net operating income (NOI) of $115,030. Based on five comparable sales of conventional properties that yielded a capitalization rate of 9.1 to 12.9 percent, he selected a 12 percent capitalization rate. To this he added 1.8 percent for taxes, giving him an overall direct capitalization rate of 13.8 percent. Dividing his NOI of $115,030 by 13.8 percent gave him an indicated value of $833,550. From this he deducted $100,000 for deferred maintenance, resulting in an indicated real market value for the subject property as of July 1, 1994, of $735,000 (rounded). Using the same approach for 1995, estimating a slightly lower net income and also deducting $100,000 for deferred maintenance, he found an indicated real market value as of July 1, 1995, of $685,000.

The department's appraisal witness, Katona, a Multnomah County appraiser, considered the highest and best use of the property as both "unrestricted and restricted." However, these views were not separately stated or explained, leaving her concept of highest and best use somewhat unclear. She also found that the cost approach was not applicable. Consequently, she relied upon the sales comparison approach and the income approach. However, her sales comparison approach relied upon seven preservation transfers. As indicated above, the court does not consider preservation transfers comparable market transactions and, therefore, will not discuss her sales comparison analysis.

In the income approach, Katona estimated NOI using contract rents and actual operating expenses. She estimated only a 5 percent vacancy in collection loss because she understands that low-income housing has long waiting lists. Her calculations indicated a net operating income, without the interest subsidy, of $116,601. Adding the annual interest subsidy of $55,050 gave her a total NOI of $171,651.

Katona did not believe that a capitalization rate should be developed from the market because of the restrictions on the property. Accordingly, she used the band of

investment method to develop a capitalization rate. This method assumes the property will be purchased with a combination of equity and debt capital. However, Katona's calculations used only a 3 percent equity with a 6 percent rate of return. This was the original equity and restricted return established by agreement with HUD in 1973. Katona conceded that in 1994, a market seller would require more than a 3 percent down payment and a greater return than 6 percent on equity. She compounded her error by continuing to use the initial debt ratio of 97 percent at the original mortgage interest rate of 7.46 percent. Consequently, her capitalization rate was not related to either the market or the date of assessment. Sensing the distortion, she added a 1.5 percent "additional risk factor" for the Section 236 restrictions. This additional risk factor was more of a guess than an estimate. Under these circumstances, the court can give little or no weight to her appraisal.

*Spencer House*

Spencer House is a forty-eight unit garden-court apartment complex in Beaverton. Constructed in 1972, it also began life as a Section 236 project, with an initial mortgage of $631,300, bearing interest at 7.5 percent. It consists of six two-story buildings centered around a parking lot that provides 1.44 spaces per unit. Except for the cedar-shingle siding and garbage disposals in the kitchens, it is similar to Piedmont Plaza.

In appraising Spencer House, Skelte again relied entirely upon the income approach. Following the same method utilized in the Piedmont appraisal, he determined a NOI of $97,455 and an overall capitalization rate of 12.12 percent. This gave him an estimated value of $804,084. After deducting $100,000 for deferred maintenance, he found an indicated real market value as of July 1, 1994, of $705,000 (rounded). For the assessment date of July 1, 1995, he used a slightly lesser NOI and a slightly lower capitalization rate to find an indicated value of $670,000.

The department's appraisal of Spencer House was a joint effort by two Washington County appraisers. Smith testified that he wrote most of the report and did most of the

income approach, while Graff did most of the sales approach and assisted Smith on the income approach. Their sales comparison approach relied entirely upon preservation transfers, which the court has already found is in error. Neither appraiser acknowledged responsibility for selecting the "comparable sales" that were used without adjustment for location, condition or other factors.

Although the appraisers appear to have relied entirely upon their sales comparison approach, the court points out that in their income approach they made the same errors as Katona. Acting on the advice of the department, they also used the band of investment method to develop their capitalization rate. They also ignored market data, using the equity-to-debt ratio established in 1975 and the initial rate of return on equity. They apparently felt constrained in both cases by the HUD restrictions. They were unable to explain how using *less* than market rates of return for a capitalization rate would result in an indication of value that reflects government restrictions.[5] Their approach suggests that government restrictions *increase* the value of property.

## ANALYSIS

In reviewing the evidence, the court finds that Skelte's appraisals have two fundamental errors: (1) he assumes the benefits and detriments of the government restrictions effectively cancel each other out, and (2) he assumes that the property would remain in the program and thus be subject to government restrictions until the year 2015.

■    Although the Preservation Act limited the prepayment right, it also provided "incentives." Simply assuming away the benefits and detriments of the government restrictions is not satisfactory. The court is required to consider the effect government restrictions have on value, *Bayridge Association, Ltd. Partnership v. Dept. of Rev.*, 13 OTR 24 (1994); *Douglas County Assessor v. Dept. of Rev.*, 13 OTR 448 (1996). There was no evidence presented at trial regarding the specific effect of the restrictions on value. Rather, Skelte simply

---

[5] A lower direct capitalization rate will result in a higher indicated value.

concluded that the effect was equal to the value of the subsidy.

■ Despite the fact that the subject properties were still subject to HUD regulation as of the assessment dates in question, it is not accurate to simply capitalize the restricted income. That approach wrongly assumes the property will be subject to HUD regulation *indefinitely*. The Preservation Act obviously provided greater benefits than simply continuing to operate as Section 236 housing.

Skelte used contract rents for the income approach even though contract rents are "considered to be above market." That could result in an indicated value that is above real market value. Although Skelte also used higher than market operating expenses and rates of capitalization, combining the factors makes it difficult to know whether the indicated value is above or below real market value.

In valuing Piedmont Plaza, Katona used actual contract rents and actual operating expenses but used a market rate of vacancy and credit losses. She based her direct capitalization rate on the initial HUD financing terms that she admitted were not 1994-95 market rates. She then added the amount of the interest subsidy to the net operating income.

■ As indicated, a direct capitalization rate based on the initial HUD financing terms is not realistic and cannot result in a reliable indication of value. Also, by adding the interest subsidy to NOI, Katona assumes the property can earn that amount of rental income. That assumption is unwarranted. The evidence indicates that the subject's contract rents are already above market. Adding the interest subsidy to gross income would be reasonable only where the property can earn that increased amount in the market place. Otherwise, the indicated value would be greater than real market value. Finally, Katona's only adjustment for the negative effects of HUD regulations on value was using the actual higher HUD-approved operating expenses. That assumes that the higher operating expenses reflect all of the negative effects of HUD regulations. That assumption has no more validity than Skelte's assumption that the benefits of the interest subsidy are offset by the detriments of the government restrictions.

Another department appraisal witness, Guthner, agreed with Skelte that the highest and best use of the property was as restricted residential property. She recognized that from the market's point of view, the properties were "in limbo." That is, although they could not prepay the mortgage as originally agreed, they were entitled to certain benefits under the Preservation Act. Acknowledging that preservation transfers were not market transactions, she nevertheless looked to them because the properties remained under HUD regulation after the transfer. She also acknowledged that even though the interest was subsidized, market purchasers would not buy the subject properties because of their limited dividends.

Guthner estimated a preservation value using the income approach. To that she added one year of "net-operating income," which she calculated to be equal to the owner's dividend plus the interest subsidy. She then discounted the total amount by 6 percent for one year to reflect the delay in realization of these benefits.

■ The court gives that appraisal no weight because the discount rate used was not a market rate, the net-operating income was not a proper operating income, and because the restrictions after a preservation transfer are longer than the restrictions before transfer. Also, it is inconsistent to view a property's highest and best use as restricted yet calculate the value as if it were unrestricted.

■ However, the court agrees with Guthner's characterization of the properties as "in limbo." That is significant because the legislature anticipated that possibility. ORS 308.205(2)(c) provides:

"If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property."

■ The court finds that there was no immediate market for the subject properties. Due to the initial Section 236 program restrictions and the subsequent imposition of the Preservation Act, the benefits that could be derived from the properties became very unclear. While the Preservation Act provided new incentives, its actual operation, the amount of

funding, and the owner's cost of participating were still real questions. As of the assessment dates in question, it was uncertain whether an owner would be able to remove the restrictions in accordance with the original agreement or would have to rely upon the preservation incentives. Neither party submitted any evidence of open-market sales of properties during that period.[6]

Finding that the subject properties had no immediate market value, what amount would justly compensate the owners for the loss thereof? In reviewing the evidence, the court finds that the preservation transfer values take on added relevance.

Some of the witnesses viewed the preservation process as a form of eminent domain, a taking by HUD. That view is somewhat justified in that the government unilaterally changed the terms of the Section 236 agreements just as the right to prepay the mortgage was about to be realized. That clearly removed some valuable rights, at least temporarily.

Preservation transfers are intended to provide owners with:

"* * * a fair market return on their investment through the receipt of incentives provided by HUD or through the transfer of the property to other entities which agree to continue the low income affordability restrictions."

The process for determining the preservation value assumes that the property is free of HUD restrictions. It also takes into account the expenses that would be incurred by an owner in converting the property to a conventional project. Thus, the process is intended to arrive at a value that the owner could expect if he prepaid the mortgage and removed the restrictions in accordance with the original Section 236 agreement. Here, the original restrictions on prepayment of the mortgages had expired or were about to expire. Consequently, it is reasonable to assume that but for the Preservation Act, the owners would have elected to prepay the mortgages and remove the HUD restrictions. Therefore, the preservation transfer value is a good measure of real market

---

[6] Wood testified that two of his seven properties were simply released by HUD and were converted to conventional market properties.

value. Except for the uncertainties surrounding the process itself, it is a surrogate indicator of the market value of the property. Accordingly, the court finds that the preservation transfer value is the best evidence of the amount that would justly compensate the owner for loss of the property.

For Piedmont Plaza, the evidence was that HUD's appraisal as of May 10, 1994, found a preservation value of $1,218,000. The owner's appraisal as of May 31, 1994, was $1,790,000, and the independent appraisal as of December 9, 1994, was $1,410,000. The property was actually transferred in February 1997 for $1,371,439.[7] The court finds that $1,371,439 is the amount that would justly compensate the owner for loss of the property as of the assessment dates in question.

The court recognizes that preservation values do not reflect the uncertainties that would surely cause market purchasers to discount a property's value. However, the court does not have data or evidence on which to base an estimate as to the amount of discount. Also, it appears that ORS 308.205(2)(c) is intended to avoid having to face that issue. From the owner's point of view, the amount of compensation for loss of the property should not be diminished by uncertainty associated with the government's administration of its own laws.

The court finds that the same value should be used for both assessment years. There is no basis for determining whether the value increased or diminished over time. Also, the court is not adjusting the value for cash reserves because cash reserves are not real estate and are not part of the property whose value is being measured.[8] Finally, the court is not adjusting the value for the owner's expenses of participating in the preservation process. While there was some testimony estimating those costs, it is not clear whether those estimates were for one project or several, whether they were recoverable in whole or in part, and whether they were out-of-pocket

---

[7] There is no explanation in the record for a transfer amount less than the value established by the independent appraisal.

[8] The price may have been negotiated and the reserves may have been considered as part of those negotiations.

costs. In addition, the testimony lacked specificity and associative details that would allow the court to use them to calculate value.

The court finds that the same approach is appropriate in valuing Spencer House. The HUD appraisal made as of April 11, 1994, estimated a preservation value of $1,350,000. The owner's appraisal made as of May 7, 1994, estimated a value of $1,375,000. The property actually transferred as of February 1997 for $1,296,542.

In summary, the goal of ORS 308.205(2) is to find the real market value of property. As of the assessment dates in issue, the extent of the government restrictions both in time and economic consequences were unclear. Due to that uncertainty, primarily caused by the Preservation Act, the property had no immediate market. Therefore, in accordance with ORS 308.205(2)(c) the court must determine the amount that would justly compensate the owners for loss of the properties. Considering all of the evidence submitted by the parties, the court finds that the preservation transfer value is the best indication of just compensation to the owner. Therefore the court finds that the real market value of the subject properties for the assessment dates in issue were as follows:

| Properties | Value for 1994 | Value for 1995 |
|---|---|---|
| Piedmont Plaza | $1,371,439 | $1,371,439 |
| Spencer House | $1,296,342 | $1,296,342 |

Costs to neither party.