Argued and submitted September 12, 2000, decision of the Tax Court reversed February 8, 2001

## PIEDMONT PLAZA INVESTORS,
*Appellant,*

*v.*

## DEPARTMENT OF REVENUE,
*Respondent.*

(TC 4123; SC S46526)

## SPENCER HOUSE ASSOCIATES,
*Appellant,*

*v.*

## DEPARTMENT OF REVENUE,
*Respondent,*

*and*

## WASHINGTON COUNTY,
*Intervenor below.*

(TC 4124; SC S46527)
(Consolidated for Review and Decision)

18 P3d 1092

Christopher K. Robinson, Lake Oswego, argued the cause for appellants. With him on the briefs was W. Scott Phinney.

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief was Hardy Myers, Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Leeson, and Riggs Justices.**

LEESON, J.

** Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case. Kulongoski and De Muniz, JJ., did not participate in the consideration or decision of this case.

**LEESON, J.**

In these consolidated tax cases, taxpayers challenge tax assessments of two low-income apartment complexes, Piedmont Plaza and Spencer House, for the tax years 1994-95 and 1995-96. The Tax Court determined that the real market value of the two properties for those tax years is the amount of money that taxpayers received through federally controlled sales of the properties, commonly known as preservation transfer sales. *Piedmont Plaza Investors v. Dept. of Rev.*, 14 OTR 440 (1998). On *de novo* review, ORS 305.445 (1995),[1] we reverse the decision of the Tax Court.

A brief discussion of section 236 of the National Housing Act (section 236 program), 12 USC § 1715z-1 (1994), and the Low-Income Housing Preservation and Resident Homeownership Act (Preservation Act), 12 USC § 4101 *et seq.* (1994), is necessary to understand the issues in this case. Congress enacted the section 236 program to increase the availability of residential housing for low-income families. The Department of Housing and Urban Development (HUD) administers the section 236 program. As part of that program, which was "active" between 1968 and 1973, HUD guaranteed 40-year mortgages by conventional lenders for properties accepted into the program. However, HUD required the mortgages to contain a restriction preventing the owners from prepaying their loans for 20 years, thereby ensuring that section 236 properties would remain available as low-income housing for at least 20 years. Through regulatory agreements, HUD also exercised extensive control over the management of section 236 properties, including setting limits on the rent that owners could charge, restricting the amount of dividends that owners could receive, and requiring owners to maintain capital reserves for maintenance and repair. In exchange, HUD paid directly to the lenders all but

---

[1] The 1995 Legislature amended ORS 305.445 to provide that this court review final decisions and orders of the Tax Court for errors of law. Or Laws 1995, ch 650, § 25. Those amendments took effect September 1, 1997, and do not apply to cases, such as this one, that were filed before that date. *See Delta Air Lines, Inc. v. Dept. of Rev.*, 328 Or 596, 600-03, 984 P2d 836 (1999) (so stating and construing 1995 amendments to ORS 305.445).

one percent of the interest payments on the loans (the interest subsidy). Owners of section 236 properties also received management fees and favorable tax treatment.

In 1990, Congress enacted the Preservation Act in response to concerns that, as the mortgages on many section 236 properties neared the 20-year mark, the owners of those properties would exercise their right to prepay their loans and remove their properties from the section 236 program. The goal of the Preservation Act was to ensure that most of the existing section 236 housing inventory would remain available for low-income families, while fairly compensating owners for the value of their properties. *See* 24 CFR § 248.1 (2000) (describing purposes of Preservation Act). The Preservation Act allows owners of section 236 properties to prepay their 40-year mortgages if HUD makes certain written findings that conversion of the properties to conventional housing will not have a detrimental effect on low-income families and the availability of low-income housing. *See* 24 CFR § 248.141 (2000) (setting out criteria for HUD approval of prepayment).

The Preservation Act also provides owners of section 236 properties two alternatives to prepayment. One is to extend the section 236 restrictions for the useful life of the property in exchange for receiving a guaranteed eight percent annual return on equity. The other is to sell the property to HUD-qualified buyers, who must agree to continue operating the properties subject to the section 236 restrictions, through the "preservation transfer" process. Preservation transfer sales allow owners of section 236 properties to sell their properties at prices that are adjusted to reflect the value of the properties as if they were not subject to the section 236 restrictions. With that background, we turn to this case.

Piedmont Plaza, located in Multnomah County, and Spencer House, located in Washington County, were built as section 236 housing in the 1970s. Taxpayers purchased the properties in the 1980s. In 1997, taxpayers sold the properties through the preservation transfer process. Piedmont Plaza sold for $1,371,439, and Spencer House sold for $1,296,342.

Multnomah County assessed Piedmont Plaza at $1,301,400 for tax year 1994-95 and $1,431,500 for tax year 1995-96. Washington County assessed Spencer House at $1,240,140 for tax year 1994-95 and $1,420,720 for tax year 1995-96.

Taxpayers appealed the counties' tax assessments to the Department of Revenue (department), which concluded that the assessed value accurately reflected the real market value of Spencer House.[2] With respect to Piedmont Plaza, the department concluded that the assessment was accurate for the 1994-95 tax year, but that there was no evidence to justify an increase in value for the 1995-96 tax year. Therefore, it held that the assessed value for Piedmont Plaza should be the same for both tax years, namely, $1,301,400.

Taxpayers filed complaints in the Tax Court, and the cases were consolidated for trial. Taxpayers and the department submitted appraisals. The Tax Court rejected all the proffered appraisals and found that there was no immediate market value for the properties. *Piedmont Plaza*, 14 OTR at 454-56. ORS 308.205(2)(c) provides that, if there is no immediate market value for a property, then "its real market value is the amount of money that would justly compensate the owner for loss of the property." The Tax Court concluded that the preservation transfer price of each property was the best evidence in the record of the amount that would be just compensation. *See id.* at 457 (so stating). Therefore, it held that those amounts—$1,371,439 for Piedmont Plaza and $1,296,342 for Spencer House—represented the real market value of the properties for the tax years 1994-95 and 1995-96. *Id.* at 459. Taxpayers have appealed that decision.

■    ORS 308.232 requires that all property be assessed at 100 percent of its real market value. ORS 308.205(1) defines "real market value" as follows:

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed

---

[2] Washington County recommended to the department that the assessment for tax year 1995-96 be adjusted to $1,368,000, and the department accepted that recommendation.

seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

Real market value is to be determined according to the statutory guidelines in ORS 308.205(2) and the "methods and procedures" adopted by the department. *See Ernst Brothers Corp. v. Dept. of Rev.*, 320 Or 294, 297-98, 882 P2d 591 (1994) (so stating). OAR 150-308.205-(A)(2)(a), which implements ORS 308.205, requires consideration of the cost approach, the sales comparison approach, and the income approach to valuation in each assessment.[3] Taxpayers must prove by a preponderance of the evidence that their approach to valuation best reflects the properties' real market value. ORS 305.427; *see STC Submarine, Inc. v. Dept. of Rev.*, 320 Or 589, 597, 890 P2d 1370 (1995) (so stating).

■    Of the three approaches to assessing real market value mentioned above, only the income approach is at issue here.[4] The income approach to valuation "measures the present value of the anticipated future stream of income attributable to [an] operating property, by discounting the [property's] anticipated cash flows to present value using a capitalization rate that reflects [an owner's] costs of investment." *Delta Air Lines, Inc. v. Dept. of Rev.*, 328 Or 596, 603, 984 P2d 836 (1999). Although the Tax Court rejected both the department's and taxpayers' income approaches to valuation,

---

[3] OAR 150-308.205(2)(d), first adopted as a temporary rule on September 15, 1997, provides methods and procedures for valuing low-income housing projects like the properties at issue in this case. That rule is inapplicable here, because the assessments at issue in this case are for tax years 1994-95 and 1995-96.

[4] Neither taxpayers nor the department presented evidence based on the cost approach, because their appraisers had considered and rejected it as inapplicable in valuing section 236 properties. Taxpayers' appraiser considered and rejected the sales comparison approach. He reasoned that there were no comparable sales, because the only relevant sales were other preservation transfer sales, and such sales are not arm's-length transactions. *See* ORS 308.205(1) (defining real market value in terms of arm's-length transactions); OAR 150-308.205-(A)(2)(c) (same). The department argued that other preservation transfer sales are comparable sales, but the Tax Court rejected that argument. *Piedmont Plaza*, 14 OTR at 449-50. The department did not challenge that holding and, in its brief to this court, the department concedes that preservation transfers do not "meet all the criteria for open market sales transactions that would allow their use in a traditional sales comparison appraisal approach." Accordingly, the only issue before this court is whether, in this case, the Tax Court erred in rejecting taxpayers' appraisals based on the income approach to valuation.

only taxpayers have challenged the holding that their appraiser's income approach to valuation did not pass muster.

■ Skelte, a private appraiser, prepared taxpayers' appraisals. Using the income approach to valuation, he determined that the real market value for Piedmont Plaza was $735,000 for tax year 1994-95 and $685,000 for tax year 1995-96. For Spencer House, he determined the values to be $705,000 for tax year 1994-95 and $670,000 for tax year 1995-96. The Tax Court found Skelte's appraisals unacceptable for two reasons, which we address in turn. First was Skelte's treatment of the interest subsidy. As explained above, one feature of the section 236 program was that HUD paid directly to the lender all but one percent of an owner's interest payments. Accordingly, taxpayers' loan payments consisted of principle and one-percent interest. The Tax Court found that, although Skelte had recognized the interest subsidy in his income approach as a significant benefit,

> "* * * he considered this benefit offset by the limited dividend and limited rent. Accordingly, he made no adjustment for the subsidy.

> "* * * * *

> "Simply assuming away the benefits and detriments of the government restrictions is not satisfactory."

*Piedmont Plaza*, 14 OTR at 451, 454.

Taxpayers argue that the Tax Court "erroneously concluded that [Skelte] *assumed* that the interest subsidy and the limited dividend canceled each other out." (Emphasis in original.) According to taxpayers, Skelte did consider the effect of the interest subsidy on the properties' income stream, and he explained at trial why he concluded that the interest subsidy should not be included as income in this instance.

At trial, Skelte explained that a buyer would not consider the interest subsidy in valuing section 236 property, because that subsidy has no effect on "positive cash flow." The amount of income that an owner might derive from a property that is subject to section 236 restrictions is determined by the amount of rent that HUD allows an owner to

charge and the limitation on dividends that an owner may receive from the property. Those restrictions set the upper limit on the amount of income that a section 236 property can generate, regardless of the amount of interest that HUD subsidizes. In other words, Skelte reasoned that the interest subsidy benefits the owner by decreasing operating expenses, but the subsidy does not have a positive effect on the amount of income that a section 236 property can generate. Accordingly, Skelte did not consider the amount of the interest subsidy as income in his income approach. The record supports taxpayers' contention that, contrary to the Tax Court's finding, Skelte considered the effect of the section 236 restrictions in his income approach, and he concluded reasonably that the amount of the interest subsidy should not be included as income.

■  The Tax Court's second criticism of Skelte's income approach was that he had "wrongly assume[d] the property will be subject to·HUD regulation *indefinitely*." *Piedmont Plaza*, 14 OTR at 455 (emphasis in original). We disagree that Skelte erred in making that assumption. It is undisputed that, in the tax years 1994-95 and 1995-96, the properties were subject to the section 236 restrictions for the life of their mortgages. It also is undisputed that, in those tax years, the Preservation Act placed additional restrictions on taxpayers' right to prepay their loans and convert the properties to conventional housing units. Angelo, an owner of and expert on section 236 properties, testified for taxpayers that owners of section 236 properties rarely can meet all the Preservation Act's additional requirements necessary to prepay their loans. Absent the ability to prepay their loans, owners of section 236 properties can elect either to extend the section 236 restrictions for the life of the properties and receive a guaranteed eight percent return on their equity, or to sell the properties through the preservation transfer process. Under either alternative to prepayment, the properties remain subject to the section 236 restrictions. On this record, we conclude that it was reasonable for Skelte to assume that Piedmont Plaza and Spencer House would remain subject to the section 236 restrictions indefinitely.

For the foregoing reasons, we conclude that Skelte did consider factors in his appraisal that the Tax Court found

that he had not considered. We hold that taxpayers have established by a preponderance of the evidence that their income approach to valuation best reflects the properties' real market value for the tax years 1994-95 and 1995-96.[5] ORS 305.427. Accordingly, we find the following real market values for Piedmont Plaza and Spencer House:

| Property | 1994-95 | 1995-96 |
|----------|---------|---------|
| Piedmont Plaza | $735,000 | $685,000 |
| Spencer House | $705,000 | $670,000 |

The decision of the Tax Court is reversed.

---

[5] In light of our holding, we do not address taxpayers' additional assignments of error.