CARL N. BYERS, Judge pro tempore.
 

 Plaintiff appeals from Department of Revenue
 
 *[401]
 
 Order No. VL 78-192, dated April 12,1978, pertaining to the assessed value of certain real property as of January 1, 1976. The property in question is identified as Tax Lot 301 and a portion of Tax Lot 300.
 

 The subject property is located in a planned unit development in the City of Wilsonville known as Char-bonneau Village. Tax Lot 301 consists of a 27-hole golf course covering approximately 74.44 acres. Only 18 of the 27 holes had been completed as of the assessment date in question. That portion of Tax Lot 300 under appeal consists of approximately one and one-half acres of land improved by a clubhouse and tennis courts.
 

 The Charbonneau development is located on the south bank of the Willamette River. Under a city zoning ordinance, a planned unit development is allowed greater density of use in some areas in exchange for other areas being permanently devoted to "open space” use. The property in question is part of the open space area, designated in the plan as a golf course, together with a clubhouse and tennis facilities. While it is not clear from the evidence that the use of the land is limited to use as a golf course, its use is restricted so that it would not be available for development per se. Other uses, for example, might be playing fields for other sports, picnic areas, park and recreation use. The golf course is approximately 4,200 yards long and, as can be seen from Exhibits 3 and 4, is interspersed among other aspects of the total development. It provides the feeling of openness and a park-like atmosphere sought for in high-quality residential developments. The course is well maintained and has three man-made lakes or ponds.
 

 The golf course clubhouse consists of a building of approximately 9,400 square feet which houses a bar, restaurant, pro shop, locker room, and a women’s golf apparel shop. The building was approximately three years old as of the assessment date in question. There are also two tennis courts with surrounding fences.
 
 *[402]
 
 The total land area covered by these improvements is approximately one and one-half acres.
 

 The parties have stipulated that the true cash value of the clubhouse and tennis courts is either zero or the present assessed value. Plaintiff’s theory is that these facilities are so closely tied to the golf course use that, if the golf course has a zero value, then the clubhouse facilities likewise have no market value. Plaintiff contends that the golf course has a zero value because (1) the area is required to be kept in open space and (2) the plaintiff cannot reasonably expect to operate the course at a profit in the foreseeable future. Plaintiff therefore concludes that it must have no value.
 

 The plaintiff’s contentions as to its financial expectations were testified to by Patrick Jordan, president of the plaintiff. Mr. Jordan testified that, by virtue of the sales representations made to buyers of lots in the development, plaintiff is contractually obligated to maintain and operate the area as a golf course for the benefit of the owners in the development. Mr. John Day, an experienced appraiser, testified on behalf of plaintiff with regard to the value or lack of value of the property. Based upon his investigation, Mr. Day concluded that the property had a zero value. His analysis rested on the conclusion that the income approach was the only valid approach to value and that for the foreseeable future the course could not be operated at a profit. Mr. Day concluded that the highest and best use of the property was not as a golf course because it was not a profitable use; at the same time, the zoning restrictions and contractual restrictions prevent any other use of value.
 

 Cross-examination revealed that Mr. Day did not utilize the market data approach because he did not consider sales of other golf courses, of which he was aware, as comparable. Specifically, he did not believe that the sale of a golf course in the Portland area known as the Rock Creek Golf Course was comparable because it lost money consistently and because the buyers were not knowledgeable or experienced in
 

 
 *[403]
 
 operating a golf course. However, Mr. Day admitted that the subject property could be sold to outsiders with some limitations. He did not project the daily fee income for the subject because he relied upon the actual income.
 

 Mr. Albert J. Kenney, an appraiser employed by the Department of Revenue, testified on behalf of the defendant. Mr. Kenney, who has some special expertise in appraising golf courses, utilized all three approaches to value. He discounted the cost approach, however, because of the "open space” restriction. Mr. Kenney’s income approach utilized projected income figures based upon an increase in annual membership fees. His investigation persuaded him that the fees charged for the use of the course were under the market. Mr. Kenney also projected the complete development of the project. Less than ten percent of the projected units were constructed as of the assessment date in question.
 

 Finally, Mr. Kenney’s use of the market approach was based primarily upon the Rock Creek sale. The Rock Creek property was similar to the subject in that it was a golf course in the middle of a planned unit development. There were a number of factors that had to be considered or adjusted by the appraiser, however, such as the larger size, special conditions of sale, additional lots to be developed and its location. Acknowledging these differences and also acknowledging that the Rock Creek course had operated at a loss, Mr. Kenney nevertheless found that it indicated a value for the subject property of $360,000, utilizing the market data approach. In his correlation of value (Def Ex A, 13) Mr. Kenney’s final conclusion of value for the subject property was $300,000.
 

 In summary, then, the plaintiff contends that the zoning restrictions plus the absence of a profit result in the subject property having a zero true cash value. The defendant, on the other hand, contends that the present profit and loss status does not control the true
 
 *[404]
 
 cash value and that, based upon all of the circumstances present, the property has a current fair market value.
 

 The plaintiff relies heavily upon the case of
 
 Tualatin Development v. Dept. of Rev.,
 
 256 Or 323, 473 P2d 660 (1970), to support its position. In that case, the parties had stipulated that the golf course had no immediate market value and the court was, under the statute, required to determine what the just compensation would be to the owner for the loss of the property. There, the evidence showed that the owner had tried unsuccessfully to give the golf course away and no one would accept it because of the governmental and contractual encumbrances burdening the property, including the ordinances of the City of Tualatin. In light of such evidence, the court concluded that the golf course had no present value to the owner and its assessed value was reduced to zero.
 

 That case was later distinguished in
 
 Brooks Resources v. Dept. of Rev.,
 
 286 Or 499, 595 P2d 1358 (1979), which likewise concerned the assessed value of a golf course which was part of a planned unit development. In
 
 Brooks,
 
 the golf course was likewise restricted to open use and operated at a loss. However, the court distinguished it from
 
 Tualatin
 
 by indicating that while
 
 Tualatin
 
 was projected to forever operate at a loss, the losses incurred by the golf course in
 
 Brooks
 
 were decreasing and could perhaps even be construed as a profit. Also, while
 
 Tualatin
 
 would continue to be unprofitable into the foreseeable future, the owner of the
 
 Brooks
 
 course failed to offer any evidence in this regard. The court did appear to reject the contention that the value in the golf course was transferred via the restrictions to the surrounding lots.
 

 The intent or objective of the developers in these cases is that by voluntarily accepting governmental and contractual restrictions upon a portion of the planned unit development, the owners of the surrounding homesites are assured that attractive open
 
 *[405]
 
 space will always be there. This has the effect of making the surrounding homesites more valuable in the marketplace. The developers, as taxpayers, also contend, however, that this renders the restricted property valueless in the marketplace. The theory is that it transfers the value that previously existed in the dedicated open space to the surrounding properties which are assessed and taxed at an "increased value.”
 

 The fallacy of this theory is the assumption that there is only so much value to be allocated among the parcels. Market value may increase in one area without detracting or taking away from another. For example, the presence of a profitable, very valuable golf course that is readily marketable may increase the value of the surrounding homes just as readily as one which operates at a loss. (Perhaps even more so.) On the other hand, value can also be diminished without it being transferred elsewhere. An easement given to the government which forever prohibits commercial or residential development of the property removes a substantial element of the value from the property. If the value can be viewed as "transferred,” it has been transferred to the public domain.
 

 In cases such as this, a distinction must be made between public or governmental restrictions, the value of which is not taxed to the private individual who may own the underlying fee, and private restrictions which are taxed to the owner of the underlying fee. In the latter case, the entire value is taxed to the "owner” for reasons of administrative convenience. Consequently, in the present case, we must distinguish between public or governmental restrictions (i.e., open space requirements) and private restrictions (i.e., contractual restrictions or representations to unit owners).
 

 The governmental restrictions are simply that the property in question cannot be developed. The area must be maintained as an open space. However, such restrictions do not prohibit the owner of the underly
 
 *[406]
 
 ing fee from using the property as open space in such a manner as to obtain a profit from it. To this extent, the open space restrictions are similar to or the same as other zoning restrictions on the use of property. For example, property which is zoned residential single family cannot be used for commercial retail uses. Normally, such property would have a lower value than land which could be used for commercial retail use. The zoning restrictions which require the subject property to be maintained as "open space” undoubtedly detract from a higher potential value. Viewed another way, its highest and best use is limited by law to some use which is consistent with the open space restrictions.
 

 Although the property may be additionally restricted in its use by virtue of contractual arrangements, obligations or representations to the unit owners in the development, such restrictions are not considered for purposes of determining the property’s assessed value. Since the benefit of the restrictions reside in individuals rather than the public, the benefit of the restrictions as well as the "remaining” uses are totaled for purposes of determining the property’s assessed value.
 
 Swan Lake Mldg. Co. v. Dept. of Rev.,
 
 257 Or 622, 478 P2d 393 (1971).
 

 In this case, the preponderance of the evidence produced by the parties supports the position of the defendant. While it is true that the property has been operating at a loss, the development is so new and the course is so far from completion as to indicate that its future prospects are much brighter than indicated by the plaintiff’s testimony. Further, the plaintiff’s evidence relied solely upon the income approach to value when it appears that there is in fact a market for golf courses which fail to operate at a net profit. A letter from Mr. Jordan to the Charbonneau homeowners, dated July 8, 1977 (Def Ex D), indicates that the unit owners have a first right to purchase all or any part of the golf course and club for an amount equal to the plaintiff’s book value. Although there was no evidence
 
 *[407]
 
 introduced as to book value of the property, this would tend to indicate that there is some value to be obtained by the plaintiff. With less than ten percent of the development complete, we may surmise that the course has value to the owner who has yet to market 90 percent of the development.
 

 Based upon the evidence adduced by the parties, the court finds the true cash value of Tax Lot 301 to be $300,000, as of the assessment date in question. By virtue of the stipulation of the parties, the assessed value of that portion of Tax Lot 300 appealed by the plaintiff, consisting of the clubhouse and tennis courts is its current assessed value of $405,820.
 

 The County Assessor and the Tax Collector of Clackamas County, Oregon, shall amend the assessment and tax rolls for the tax year 1976-1977 in accordance with this opinion. If taxes have been paid by the plaintiff in excess of those required by the tax roll as amended, the excess, with statutory interest thereon, shall be refunded to the plaintiff by the Board of County Commissioners of Clackamas County, Oregon, pursuant to ORS 311.806 and 311.812. Costs to neither party.