## IN THE OREGON TAX COURT

## PARKSIDE PLAZA APARTMENTS
*v.*
## DEPARTMENT OF REVENUE
(TC 2146)

Richard A. Hayden, Stoel, Rives, Boley, Fraser & Wyse, Portland, represented plaintiff.

Ms. Marilyn Harbur, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered September 30, 1985.

**CARL N. BYERS, Judge.**

The issue for determination is the true cash value as of January 1, 1981, of land located in the South Auditorium Addition. The parcel contains approximately 97,334 square feet and is restricted under the urban renewal plan to use for residential apartments.

The Portland Development Commission's urban renewal plan for this area was initially adopted in 1963. According to the evidence adduced, the property was acquired sometime during the 1960's, appraised for purposes of establishing a sale price in 1974 and then offered for sale by the agency at approximately $3 per square foot or approximately

$299,000. The property was apparently on the market for a substantial period of time before the developer, Mr. Jack Saltzman, agreed to purchase the property.[1]

In April, 1976, the developer entered into a written agreement with the agency to develop the property in accordance with the urban renewal plan. However, title to the property did not pass until April 1978, and it appears from the evidence that the apartment units were not constructed on the land until 1980.

The large size of the parcel, combined with the restrictions imposed by the urban renewal plan, presents an unusually difficult appraisal. As a result, the appraisers vary substantially in their opinions and conclusions. Plaintiff's appraiser employed what he termed a cost approach and an income approach. Since only the land is under appeal, plaintiff's cost approach is in fact a market comparison approach. In utilizing this approach, the appraiser considered only the sale of the subject property, which he viewed as occurring in 1978, and the sale of the "Cornerstone" property which occurred in July 1984. He also employed an income approach in order to determine the value of the improvements and the land, but that approach resulted in an indication of a negative value for the land. Based on the limited data available to him, the appraiser concluded that the land value, as of January 1, 1981, was the same as its cost in 1978 plus some expenses which were incurred in connection with the purchase, resulting in a total value of $380,000.

Defendant's appraiser, Mr. Gambee, also utilized the market comparison approach. However, he felt that the sale of the subject property, based on a price established in 1974, was not relevant to 1981. Also, plaintiff's other comparable sale, the "Cornerstone" (on Southwest Front) could not be considered because it occurred three years after the assessment date in question. Mr. Gambee utilized four substantially smaller sales, one occurring in 1978, one in 1980, and two in 1982. Based on his analysis of these sales, Gambee developed a cost

---

[1] Plaintiff's appraiser testified that the property had been on the market for over 10 years. However, plaintiff's other witness, J. David Hunt, testified that the property was not appraised until 1974. While the court understands Mr. Hunt's testimony to indicate that the property was in fact vacant for 10 years, it is unlikely that it was offered for sale on the market until after the 1974 appraisal.

per square foot of maximum potential floor area.[2] Believing that purchasers of comparable properties are influenced by the maximum floor area ratio (FAR) allowed, Mr. Gambee concluded that the subject property would sell for $3.50 per square foot of floor area allowed. Inasmuch as the subject property has a FAR of 3:1, this means that improvements could be constructed having a floor area three times the area of the land, which is 97,334. Thus, the developer could construct an apartment on the subject land having 292,002 square feet. Based on his analysis of the comparable sales, Mr. Gambee concluded that multiplying 292,002 square feet by $3.50 per square foot resulted in a land value of $1,022,000.

Although the appraisers for both parties strongly disagree on some points, analysis of their testimony indicates that there are several important points on which they do agree. Both appraisers apparently feel that the subject land was developed "too soon" in view of the market needs and the state of the economy. They also agree that the restrictions imposed by the urban renewal plan, particularly the limitation that precludes the developer from speculating in the land, is an important restriction on the value of the developer's interest. They also agree that the current value of the land and improvements together is substantially less than the depreciated reproduction cost of the project.

Where they disagree is in considering the effect of the urban renewal conditions and restrictions on the value of the property. Plaintiff's appraiser apparently considers the restrictions as limitations which are recognized in the marketplace and limit the value of the property. Defendant's appraiser, on the other hand, ignores such restrictions and conditions with the understanding that property taxes are imposed on all of the interests in the property and not just the portion purchased by the developer. It is readily apparent that one of the two appraisers must be correct and the effect to be given to the restrictions is, in Mr. Gambee's words, "profoundly important."

ORS 308.235 provides:

---

[2] One of the limitations imposed by the city on building is the "floor area ratio," or "FAR," which is the ratio between the number of square feet of land upon which the improvements are constructed and the number of square feet in the improvements.

"Valuation of land. (1) Taxable real property shall be assessed by a method which takes into consideration:

"(a) The applicable land use plans, including current zoning and other governmental land use restrictions;

"(b) The improvements on the land and in the surrounding country and also the use, earning power and usefulness of the improvements, and any rights or privileges attached thereto or connected therewith; and

"(c) The quality of the soil, and the natural resources in, on or connected with the land, its conveniences to transportation lines, public roads and other local advantage of a similar or different kind."

■ In applying the statute, Oregon courts have followed the general rule in ad valorem tax that the entire value of the land is to be assessed to the holder of the legal title without regard to the other interests. *First National Bank v. Marion County,* 169 Or 595, 612, 130 P2d 9 (1942). In expressing the rule with regard to the effect of leases, the Oregon Supreme Court in *Swan Lake Mldg. Co. v. Dept. of Rev.,* 257 Or 622, 625, 478 P2d 393, 480 P2d 713 (1971), stated:

"In fixing the true cash value of land for property tax purposes the effect of existing leases on the value to the owner is disregarded. The basis for such a principle is that the tax is levied upon the land and is a tax upon all the interests in to which the land might be divided. Admittedly, a lease might decrease the price which the owner might receive; however, the tax is not merely upon the owner's interest; the tax is upon all the interests in the land, including the leasehold interest."

There are two recognized exceptions to the general rule. The first is that the effect of easements appurtenant are recognized. Such easements may cause a shift in value from the servient estate to the dominant estate but will not otherwise increase the administrative burdens of the tax. *Rockwood Development Corp. v. Dept. of Rev.,* 10 OTR 95 (1985). *Tualatin Develop. v. Dept. of Rev.,* 256 Or 323, 330, 473 P2d 660 (1970).

■ The second exception covers restrictions which are imposed upon property for the benefit of the public. Where the benefit of the restriction resides in the public, the restriction is viewed akin to zoning or other governmental regulations which govern the use of the property generally.

*See Borough of Englewood Cliffs v. Estate of Allison,* 69 NJ Super 514, 174 A2d 631 (1961), cited in *Tualatin Develop. Co. v. Dept. of Rev.,* 256 Or 323, 473 P2d 660 (1970). Also, *Willamette Factors v. Dept. of Rev.,* 8 OTR 400 (1980).

As indicated above, the property is subject to certain conditions imposed to accomplish the purposes of the urban renewal plan. The primary restriction considered by the appraisers is a restriction which limits speculation. This appears to be subsection (2)(d) of section D of the South Auditorium Urban Renewal Plan. That subsection provides:

> "The developer will be obliged, under the terms of the disposition instrument, to carry out certain specified improvements in accordance with this Plan and the Declaration of Restrictions. The developer will not be permitted to dispose of the property until the improvements are made without prior written consent of the Urban Renewal Agency, which consent will not be granted except under conditions that will prevent speculation and protect the interests of the City of Portland. The disposition instrument will contain a provision consenting to the disposition of all or any part of the developer's interest in the project area, such consent to be effective upon the completion by the developer of all of the improvements, rebuilding and the development work required." (Exhibit 1, at 39-40.)

In addition to this restriction, the urban renewal plan contains a number of other conditions and limitations with which the developer must comply.

In addition to the conditions and restrictions contained in the plan, the deed by which plaintiff obtained title to the land also contains a number of covenants. Some of these covenants require the developer to develop the property in accord with a plan within 24 months of purchase. (Exhibit 4, at 3.) The Portland Development Commission, as well as the federal government, are made beneficiaries of the covenants contained in the deed which expressly run with the land. The conveyance of the deed is expressly made "upon condition subsequent" so that if the developer breaches or defaults, the urban renewal agency can reenter the property, take possession of it and terminate the developer's interest, thereby revesting title in the property in the agency. (Exhibit 4, at 7.)

The evidence demonstrated the importance of these

restrictions, particularly the prohibition against speculation. Both appraisers deemed the latter restriction to be significant and it is apparent that Gambee would have reached a value less than plaintiff's if he had considered the effect of the restriction in forming his opinion. On cross-examination he indicated that the total fee for the property was worth $1,022,000 and that the value of the restriction was approximately $700,000. He further agreed that the tax benefits and the advantageous purchase of the adjacent commercial parcel were necessary to bring the purchase price of the subject property up to $300,000. In view of this reasoning, Mr. Gambee might well have concluded that the subject land has zero value because of the required "premature development."

The court finds that the restrictions described above are imposed by government for the benefit of the public. Consequently, such restrictions must be considered by the appraisers in valuing the property for ad valorem tax purposes. Since defendant's appraiser did not do so, his opinion must be discounted accordingly.[3]

The evidence in this case is not particularly impressive but it is sufficient to persuade the court that the plaintiff is entitled to relief. Plaintiff's only comparable sale, other than the subject property, is not comparable. The "Cornerstone" sale was too remote in time and was not an arm's-length transaction. The sale price for the subject property appears to have been established in 1976 when the plaintiff entered into the agreement to purchase the property. The changes in the economic climate and circumstances which occurred between 1976 and the assessment date in 1981 are so great as to require the court to reject the purchase of the subject as a "comparable sale." However, in the absence of any market for this property and the unusual conditions attached to it, the cost is probably as good a measure as can be obtained. The sales proposed by defendant are not sufficiently comparable in size or restrictions to be considered.

Accordingly, the court finds that the true cash value of the subject land as of January 1, 1981, was $380,000. The

---

[3] Gambee's analysis based on the maximum FAR was also subject to question to the extent that the evidence showed that large parcels were not developed to their maximum FAR. This result apparently is dictated by the market for improvements, in this case residential units.

order of the Department of Revenue is hereby set aside and judgment will be entered consistent with this opinion. Costs to neither party.