IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| DORCHESTER HOUSE RETIREMENT COMMUNITY LLC, | ) ) ) | |
| Plaintiff, | ) ) | TC-MD 140111N |
| v. | ) ) | |
| LINCOLN COUNTY ASSESSOR, | ) ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision entered

November 14, 2014. The court did not receive a request for an award of costs and disbursements

within 14 days after its Decision was entered. *See* TCR-MD 19.

Plaintiff appeals the real market value of properties identified as Accounts R448071,

R445748, R410325, and R450430 (subject property) for the 2013-14 tax year. A trial was held

in the courtroom of the Oregon Tax Court in Salem, Oregon, on September 10, 2014. W. Scott

Phinney (Phinney), Registered Appraiser, appeared and testified on behalf of Plaintiff. Kristin

Yuille, Assistant County Counsel, appeared on behalf of Defendant. Kathy Leib (Leib),

Registered Appraiser 3, testified on behalf of Defendant. Plaintiff's Exhibits 1 through 9 were

received without objection. Defendant's Exhibits A through H were received over Plaintiff's

relevance objection.

I. STATEMENT OF FACTS

Phinney testified that the subject property, the Dorchester House, is an historic site

located on Highway 101 in Lincoln City. (*See* Ptf's Ex 1 at 3 (photograph of subject property).)

He testified that the subject property includes a main building, constructed in 1929, and a wing, constructed in 1984. (*See id.* at 13.) Phinney testified that the old, main building is 18,511 square feet and the new wing is 26,205 square feet, for a total building size of 44,716 square feet. (*Id.*) Leib testified that the subject property was originally used as a hotel when it opened in 1935 and the subject property is still a Lincoln City landmark. (*See* Def's Ex A at 3.) Phinney testified that the subject property was re-developed in 1991 under a government program and thereafter used for senior, disabled, and low-income housing. He testified that the subject property included 70 units, one of which is a manager unit. Leib testified that as of January 1, 2013, the subject property was a 67-unit "senior living apartment building" for residents over the age of 58. (*See id.*) She testified that one unit is provided to the on-site manager.

Phinney testified that Plaintiff purchased the subject property for $2.3 million in 2010, subject to the approval of the Oregon Housing and Community Services Department (Housing Department) and the bankruptcy court. Leib wrote in her report that the subject property was sold "out of bankruptcy court to [Plaintiff], on a Special Warranty Deed dated June 1, 2010, with the consideration shown as $2,300,000." (Def's Ex A at 4.) She testified that the sale price included $75,000 of personal property. (*Id.* at 25.) According to the sale confirmation questionnaire, the subject property sale was "a forced sale" that was not advertised on the open market. (*Id.*) Leib testified that she concluded that Plaintiff was a sophisticated buyer and would have paid market value for the subject property in the 2010 sale. (*See id.* at 26-35.)

Phinney testified that as of December 31, 2012, 53 of the subject property's units were occupied. (Ptf's Ex 1 at 29-30 (December 31, 2012 and December 31, 2013, rent rolls).) He testified that the subject property's tenants are not offered nursing or memory care, but they are offered food services, housekeeping, transportation, and activities, each at an additional expense.

(*See id.* at 15-16 (activity schedule, menu).)  Phinney testified that the subject property's rent rolls reported a variety of rates because some tenants receive full meal services, housekeeping services, and transportation services.  (*See id.* at 29-30.)  He testified that in the past, the subject property was more like a nursing home and provided more services, such as the meal plan. Phinney testified that Plaintiff must continue to offer meals as long as the 10 to 12 tenants who purchased a meal plan live at the subject property.  He testified that because the tenants choose whether to eat in the subject property's dining room, the kitchen is functionally obsolete. Phinney testified that the subject property's units also suffer from functional obsolescence because they have kitchenettes and not full kitchens.  (*See id.* at 14 (unit floor plans).)

Leib testified that she inspected the subject property on July 11, 2014, and found it to be in "good repair."  (*See* Def's Ex A at 5.)  She testified that she viewed studio and one-bedroom units, each of which included a kitchenette with a two-burner stove, a microwave, a sink, and small refrigerator.  Leib testified that the subject property's rent includes electricity, heat, water and sewer, laundry facilities, and basic cable television.  (*Id.* at 3.)  She testified that meals, housekeeping, and transportation services used to be included in the subject property's rent when it was operated like a nursing home.  (*See id.*)

Phinney wrote in his appraisal report that the subject property's site is 1.37 acres.  (Ptf's Ex 1 at 13.)  He testified that the subject property's use is a conditional use, so the subject property probably could not be rebuilt if it were destroyed.  (*See id.* at 19-21 (zoning).)  Leib testified that uses surrounding the subject property include a mix of residential and commercial development.  She testified that the Lincoln City zoning department told her that the subject property's current use is a permitted use as a "boarding house."

/ / /

A.     *Governmental Restrictions*

Phinney testified that the subject property is subject to governmental restrictions pursuant to the Loan and Regulatory Agreements. (Ptf's Exs 2, 3.) He testified that the Loan Agreement is in effect until at least 2020. (*See* Ptf's Ex 2.) Phinney testified that the Agreements were enacted for the benefit of low and moderate income individuals at the expense of the owners. (Ptf's Ex 3 at 12.) Phinney testified that the agreements provide that a tenant must be a "low or below median-income person or family * * * and the head of the household is 58 years of age or older," or "a disabled person," and 20 percent of units must be occupied by low or moderate income persons.[1] (Ptf's Ex 2 at 10; Ex 3 at 6.) Phinney testified that Section 8 tenants and HUD vouchers must be accepted. (Ptf's Ex 3 at 9.)

Phinney testified that the Loan and Regulatory Agreements impose several other restrictions on the subject property. A proposed schedule of rental rates must be submitted to the Housing Department at least 60 days prior to a proposed rent increase; all rental rate changes must be approved by the Housing Department. (Ptf's Ex 2 at 8.) Tenants' security deposits must be held in an interest bearing account; the tenants receive the interest. (*Id.*) A reserve account must be created with the Housing Department and funded up to $147,000. (*Id.*) Management must be in compliance with a management agreement with the Housing Department. (*Id.* at 10.) The Housing Department "shall approve the management agent and plan" and the management plan shall not be amended, modified, or terminated without the written consent of the Housing Department. (*Id.*) A "complete financial statement audited by an independent [CPA]" must be submitted to the Housing Department at the end of each fiscal year. (*Id.* at 12.) The subject

/ / /

---

[1] "[L]ow or moderate income persons" are defined as income 80 percent or less of area median gross income. (Ptf's Ex 3 at 6.)

property may not be sold, transferred, or otherwise disposed of without the prior written consent of the Housing Department. (Ptf's Ex 3 at 11.)

Phinney testified that the 2010 sale of the subject property was arranged by the Housing Department and the bankruptcy court and the governmental restrictions were in place as of that sale. (*See* Ptf's Ex 7 at 2 (Consent to Assignment, Transfer, Assumption and Modification Agreement signed June 1, 2010, pursuant to which Plaintiff "unconditionally assume[d] all obligations of Successor Borrower to the [Housing] Department under the Loan Instruments").)

Leib testified that several weeks before trial, she learned that the subject property was subject to governmental restrictions. She testified that she found and reviewed the subject property's original trust deed. Leib testified that she called the Housing Department, which told her that the subject property was not low-income housing. She testified that the income restrictions only apply to 20 percent of the units, which must be held for tenants who receive 80 percent of the median income. Leib testified that there are no income restrictions on the other 80 percent of the units, although all units are restricted based on age or disability.

B.      *Plaintiff's Real Market Value Evidence*

Phinney concluded the subject property's highest and best use as improved is probably its current use, given the governmental restrictions. (Ptf's Ex 1 at 21.) He testified that he did not use the cost approach because: (1) there was no way to account for the governmental restrictions; (2) the subject property was built in 1929, so the depreciation deduction would be large; and (3) the subject property suffered from functional obsolescence due to the kitchen and some features of the units. (*See id.* at 22.) Phinney testified that he did not use the market approach because it is impossible to find arm's-length sales of properties subject to governmental restrictions; by definition, the government is involved in any transfer of such properties. Phinney testified that

in all of the low-income housing cases, courts used the income approach based on actual income and expenses, which are affected by the government restrictions. (*See id.*)

Phinney testified that only two years of income data were available as of January 1, 2013. (*See* Ptf's Ex 1 at 22.) He testified that he gave more weight to the 2012 income and expense data. Phinney testified that he used the subject property's actual effective gross income of $565,590 for 2012, which included any income from food service. (*See id.* at 24.) Phinney testified that he used the subject property's actual operating expenses, but removed property tax expenses. (*See id.* at 22, 25-28.) Phinney testified that his management expenses of $2,813 and reserves of $10,782 were both dictated by the regulatory agreement. (*See id.* at 24.) Phinney testified that a management expense of $38 per unit is "pretty miniscule." He wrote in his report that net operating income was $136,007. (*Id.*)

Phinney testified that to determine a capitalization rate, he identified two sales of "senior living projects in Oregon" that reported rates of 7.4 and 15 percent. (Ptf's Ex 1 at 23, 31.) He testified that one of his capitalization rate sales was a senior living facility that also provided rehabilitation facilities and the other was an assisted living facility, which is different than a nursing facility. (*Id.* at 32-33.) Phinney testified that he could not find any comparable sales from Lincoln County or surrounding counties. He testified that he also considered capitalization rates reported in a Realty Rates survey and he selected a base capitalization rate of 8.80 percent. (*Id.* at 24, 34.) Phinney testified that he added an effective tax rate of 1.45 percent to the base capitalization rate. (*Id.* at 22, 24, 40.) He testified that he made an upward risk adjustment of 35 percent to the base capitalization rate due to the governmental restrictions for an overall rate of 13.33 percent. (*Id.*) Phinney testified that the overall rate reflects the loss of certain property

/ / /

rights and the increased risk to the subject property's owner. He testified that he concluded a total 2013-14 real market value of $1,020,300 under the income approach. (*Id.*)

C. *Defendant's Real Market Value Evidence*

Leib wrote in her report that the subject property's highest and best use "is its current use." (Def's Ex B at 3.) She wrote that she used all three approaches of value. (Def's Ex C at 1.)

1. *Cost Approach*

Leib wrote in her appraisal report that she found five sales of commercially zoned land in Lincoln City, only one of which was of a "larger physical area." (Def's Ex D at 1.) Of the five land sales that Leib described, the largest was a 20,950-square-foot parcel "located in the central core area of Lincoln City" with "east side frontage on Highway 101" that sold for $510,000 on January 17, 2014. (*Id.* at 2.) Leib wrote that she was unable to confirm that sale with the buyer's realtor. (*Id.*) She testified that based on that sale, she concluded an indicated bare land value of $24.34 per square foot, or $1,495,700 for the subject property. (*Id.* at 3.) Leib testified that the average price of her five sales was $13.66 per square foot, indicating a bare land real market value of $839,134 for the subject property. (*See id.* at 4.)

Leib testified that she used the Marshall & Swift cost factors for the structure type "garden apartments" and the subcategory "senior citizen (independent living)," which is described as buildings that "may have limited individual kitchen facilities and/or common kitchenette and recreation areas associated with congregate housing for the elderly." (*See* Def's Ex C at 1-2 (internal quotation marks omitted).) She testified that she concluded a total depreciated improvements cost of $2,257,520. (*See id.* at 2-5.) Leib testified that she added a land value of $1,609,700 for a total indicated real market value of $3,867,220. (*See id.* at 5.)

2.    *Sales Comparison Approach*

Leib testified that she identified five sales from 2008 through 2014, but rejected two of them as unusable. (*See* Def's Ex E at 1.) She testified that her first sale was of the Pinehurst Apartments for $3,000,000 on September 27, 2013. (*Id.* at 1-2.) Leib testified that sale 1 included seven buildings with 44 units and a combined building size of 36,986 square feet. (*Id.*) She testified that the sale 1 site was 2.6 acres. (*Id.*) Leib testified that the sale 1 apartments were in good condition and were "standard, cookie cutter" apartments. (*See id.*) In her appraisal report, Leib described her other two sales as "historic sales." (*Id.* at 2.) She testified that the two "historic sales" are not relevant to her valuation of the subject property. Leib testified that she used price per square foot as the unit of comparison and concluded an indicated value of $3,626,994 for the subject property based solely on sale 1, Pinehurst. (*See id.* at 3.) She testified that the Pinehurst units all included kitchens and garages or carports and some included washers and dryers. Leib testified that she made no adjustments to sale 1, although she subtracted the garage square footage from the total square feet.

3.    *Income Approach*

Leib testified that she considered the subject property's actual income and expenses as well as market rates. (*See* Def's Ex F at 1.) Leib testified that she received information from the subject property's manager, reporting the "current" rents and room mix. (*Id.* at 12.) She wrote that the subject property included 19 studios that rent for $725 per month, 45 one-bedroom units that rent for $775 per month, and two two-bedroom units that rent for $900 per month. (*Id.*) Leib testified that the subject property's expenses were very high compared with its income. She testified that the actual vacancy rate reported at the subject property and at her three apartment

/ / /

rent comparables was each about one percent. (*See id.*) Leib testified that the subject property rents are comparable to or higher than other apartments.[2]

Leib wrote in her appraisal report that using the subject property's actual income and expenses, she determined its net operating income in 2012 was $131,511. (Def's Ex F at 2.) Using a capitalization rate of nine percent, she wrote that the subject property's indicated real market value based on actual income and expenses was $1,461,233. (*Id.*) Leib wrote that,

> "When a stabilized income, using current rents with an estimated vacancy rate of 10 [percent], and an average expense percentage of 40 [percent] was applied to the potential gross income for the complex, the application of a cap rate of 9 [percent] indicated a real market value of $3,517,200."

(*Id.* at 1.) Leib wrote that using the subject property's actual rents, 10 percent vacancy, 40 percent expenses, and a nine percent capitalization rate indicated its real market value was $3,632,400. (*Id.* at 12.) She testified that she concluded an indicated value of $3,632,400 under the income approach. (*See id.*)

Leib testified that 40 percent expenses is an "industry standard" for a building of the subject property's age and is supported by LoopNet reports for national apartments. She testified that her expenses for the subject property did not include housekeeping, food service, activities, or extra accounting fees; rather, she used typical expenses for garden apartments. Leib testified that her income conclusion also excluded the subject property's food and housekeeping. She testified that it is unusual for apartment owners to pay for utilities, so the typical expense ratios probably did not include utilities.

Leib testified that she was unable to find any meaningful distinction between the subject property and other apartments. She testified that there is no rent differentiation between the 20

---

[2] Leib reported the following rent for the Pinehurst Apartments: $720 per month for one-bedroom units with a washer and dryer; $775 per month for two-bedroom units with a washer-dryer hookup; and $750 per month for two-bedroom units without a washer-dryer hookup. (Def's Ex F at 13.)

percent low-income tenants and the other tenants. Leib testified that at most, the additional risk factor added to the capitalization rate should only apply to the 20 percent of rooms for low-income tenants. She testified that by using the 35 percent capitalization rate adjustment for 20 percent of the units and using a 5 percent adjustment for the remainder of the subject property, she determined a real market value of $3,082,880.

    4.    *Reconciliation*

    Leib testified that there were many limitations with the cost approach because of the subject property's unique features. (*See* Def's Ex G at 1-2.) She testified that the income approach was "too volatile" and was affected by the fact that the subject property is in transition from a senior living facility with more services to one with less. (*See id.*) Leib testified that she thought the sales comparison approach was the best approach in this case. (*See id.*) She testified that she concluded a 2013-14 real market value of $3,626,994. (*See id.*)

D.    *Tax Roll Values and Requested Real Market Value*

    The subject property's total tax roll real market value was $2,118,120 for the 2013-14 tax year. (Ptf's Compl at 2.) Leib testified that the subject property's 2013-14 tax roll real market value was set based on the 2010 sale of the subject property. The subject property's total maximum assessed value was $1,869,270 for the 2013-14 tax year. (*Id.*) Plaintiff requests that the court reduce the total real market value to $1,020,300. (Ptf's Ex 1 at 24.) Defendant requests that the court increase the total real market value to $3,626,994. (Def's Ex G at 2.)

II. ANALYSIS

    The issue before the court is the real market value of the subject property for the 2013-14 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No

020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1),[3] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2013-14 tax year was January 1, 2013. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). The three approaches of value that must be considered under the applicable administrative rule are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.*

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citation omitted). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [its] burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

/ / /

/ / /

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

A.    *Governmental Restrictions*

Plaintiff asserted that the subject property was subject to governmental restrictions as of January 1, 2013, and must be valued in accordance with ORS 308.205(d) and applicable case law.  (*See generally* Ptf's Tr Memo.)  ORS 308.205(d) states:

> "If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, real market value shall not be based upon sales that reflect for the property a value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions."

In *Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.*, 321 Or 21, 31, 892 P2d 1002 (1995), the Oregon Supreme Court concluded that "a 'governmental restriction as to use,' * * * need not be involuntary and may result in an economic benefit to the taxpayer."  In that case, the property at issue received tax credits related to the provision of low-income housing and taxpayer was required to maintain 20 percent of the units as "Rent Restricted Units for low-income tenants" for 15 years.  *Id.* at 26-27.  The restrictions resulted from a voluntary agreement between the taxpayer and "OHA that limited the rents that taxpayers could charge to tenants residing in taxpayers' properties and limited the pool of tenants to whom they could rent apartments."  *Id.* at 29.  The Oregon Tax Court had also concluded that the property at issue was subject to governmental restrictions and had concluded that "the true cash value of the properties should be measured by their actual or contract rents."  *Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.* (*Bayridge*), 13 OTR 24, 31 (1994).

This court has subsequently used the income approach in several cases to determine the real market value of governmentally restricted housing projects.  In *Douglas County Assessor v. Dept. of Rev.*, 13 OTR 448, 452 (1996), this court concluded that the "income approach, as a measure of real market value, considers governmental restrictions imposed on a property if those

restrictions would not be removed by sale of the property." At issue was an apartment complex constructed under a loan through the Farmers Home Loan Administration. *Id.* at 449. In exchange for a favorable interest rate, "the owner was required to commit the property to serve low-income tenants as part of the Rural Rental Housing program. * * * Under this program, a government agency sets the rents, and the owner is limited to an eight percent return on the initial investment each year." *Id.* (citation omitted). In *Wilsonville Heights Assoc., Ltd. v. Dept. of Rev.* (*Wilsonville Heights*), 17 OTR 139, 155 (2003), this court stated "the direct capitalization method is appropriate for use, especially in the early years of a government program."

In 2001, the legislature created an optional "new taxation regime for low-income housing projects." *Dept. of Rev. v. Butte Creek Associates I*, 19 OTR 1, 3 (2006). ORS 308.704 states,

> "[a]n owner of multiunit rental housing that is subject to a government restriction on use may choose, at the direction of the owner, to have the multiunit rental housing assessed under the special assessment provided in ORS 308.707 or may choose to have the multiunit rental housing assessed under the ordinary methods of assessing property in this state."

In order to receive that special assessment, "[t]he owner of the property [must have] filed an application for special assessment under ORS 308.709 and that application [must have] been approved." ORS 308.707(1)(b). There is no evidence in this case that Plaintiff submitted an application under ORS 308.709 to elect special assessment of the subject property.

B.      *Approaches of Value--Income Approach*

Plaintiff used only the income approach to determine the subject property's real market value. Defendant submitted evidence under all three approaches, but the court finds Defendant's cost and sales comparison approach evidence unpersuasive. "The cost approach is 'particularly useful in valuing new or nearly new improvements.' " *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006). The subject property was constructed in 1929 and 1984, so it was not "new or nearly

new" as of January 1, 2013. In addition to the problem of measuring depreciation in this case, the cost approach does not account for the governmental restrictions and, therefore, overstates the subject property's real market value. Under the sales comparison approach, the "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson*, WL 21263620 at *3. Here, a sale of the subject property requires the prior, written consent of the Housing Department; thus, any sale would not be arm's-length. Defendant relied on one sale of an apartment complex that was not subject to any governmental restrictions comparable to the subject property; that sale does not provide persuasive evidence of the subject property's real market value. The court concludes that the income approach best reflects the subject property's real market value as of January 1, 2013.

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 253 (2003) (citation omitted). "A basic requirement of the income method is fixing an annual income to capitalize." *Pacific Power & Light Co. v. Dept. of Revenue* (*Pacific Power*), 286 Or 529, 540, 596 P2d 912 (1979). The Oregon Supreme Court "decided that the flow of income to be determined is that which 'would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date[.]' " *Pacific Power*, 286 Or at 542, citing *Mt. Bachelor v. Dept. of Rev.*, 273 Or 86, 539 P2d 653 (1975). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income." *Allen*, 17 OTR at 253. Net operating income "is the currently expected net income of a property after all operating expenses are deducted from gross income." *Id.* at 254. "To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* "[T]he income approach

should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v. Multnomah County Assessor*, TC-MD No 110621D at 14 (Feb 27, 2012) (citations omitted).

Both appraisers utilized the income approach, but reached different real market value conclusions. Those differences are driven primarily by the vacancy rate, the expenses, and the capitalization rate. There is a dispute as to the number of units in the subject property, which impacts its income. Leib reported that the subject property included 66 units available for rent and reported actual rental rates consistent with that figure. Phinney testified that the subject property included 70 units, but presented no supporting evidence. The court is persuaded that the subject property included 66 rental units as of January 1, 2013.

Ordinarily under the income approach, potential gross income is calculated and vacancy is subtracted to determine effective gross income. Phinney did not separately calculate potential gross income and subtract vacancy to determine effective gross income. Instead, he used Plaintiff's actual income for 2012, which he reported to be $565,590. However, Phinney testified that as of December 31, 2012, only 53 of the subject property's units were occupied, indicating a vacancy rate of 20 percent based on 66 units. Phinney's effective gross income implicitly included a 20 percent vacancy deduction. The problem with using the subject property's reported actual income from 2012 is that the subject property was not stabilized as of that date. In *Bayridge*, 13 OTR at 31, this court found that it could use the income approach to determine the real market value of a low-income housing property even though the property "was not complete and operating on the assessment date," because the plaintiffs "[a]ssum[ed] 100 percent occupancy," which "[overcame] the lack of an income history and provide[d] a

reasonable basis for using the income approach." In this case, only two years of income and expense information were available as of December 31, 2012, and Plaintiff conceded that the 2011 information was less useful. The court finds that Phinney's effective gross income is not persuasive because it does not reflect the subject property's stabilized income.

Based on the subject property's actual rental rates reported by Leib and its profit and loss statements provided by Plaintiff, the court concludes that the subject property's potential gross income was $639,049.[4] Leib used a vacancy rate of 10 percent in her income approach, although she provided no evidence in support of that rate. She wrote that the actual vacancy rate for the subject property and other apartments in Lincoln City was about one percent. The court finds the vacancy rate evidence presented is inconclusive.

To determine net operating income, operating expenses are subtracted from effective gross income. Phinney used the subject property's actual operating expenses from 2012, less property taxes. Leib used a 40 percent expense ratio, reportedly based on the "industry standard" and on national surveys. The court finds that the subject property's actual expenses plus reserves provide the best evidence of expenses in this case. Pursuant to the governmental restrictions and existing tenant contracts, the subject property incurs certain expenses that are not typically required of other apartments. Specifically, the subject property's expenses include food service, housekeeping, activities, transportation, tenant utilities, and increased accounting fees. As Leib stated in her report, the subject property may be transitioning away from the provision of food service and housekeeping. However, as of January 1, 2013, the subject property provided those services based on existing tenant contracts. Leib acknowledged that her 40 percent expense ratio

/ / /

---

[4] That figure is based on potential rental income totaling $605,400 and Plaintiff's reported "other revenue" of $33,649 in the year ending December 31, 2012. (Ptf's Ex 1 at 25.)

is based on surveys of properties that do not typically provide tenants with food service, housekeeping, transportation, activities, and utilities.

"The capitalization rate developed should be a reflection of general-market realities. Such rates are typically developed either from examination of actual sales and income data or from methods such as the band-of-investment approach." *Wilsonville Heights*, 17 OTR at 155. Phinney determined a base capitalization rate of 8.8 percent based on two sales of "senior living projects in Oregon" and on a Realty Rates survey. Those sales were concededly not located in Lincoln City or comparable to the subject property. Phinney added a tax rate of 1.45 percent and made an upward 35 percent risk adjustment. He offered no evidence in support of the 35 percent risk adjustment. Leib used a capitalization rate of nine percent. It is unclear what evidence she used to determine that rate. Leib testified that after considering the subject property's governmental restrictions, she applied a risk adjustment of 35 percent to 20 percent of the subject property's units and five percent to the remainder of the units.

In *Wilsonville Heights*, the plaintiff's appraiser "inspected and analyzed the capital markets and financing practices as of the assessment dates in question[,]" based on which he "concluded a base band-of-investment rate of 10 percent." 17 OTR at 159-60. He added the property tax rate and "a component of 3 percent, which he felt was necessary to adjust the market rate to account for the following features of the subject property: lack of income increase; lack of property appreciation; and extremely long holding period." *Id.* The court was persuaded

> "that an upward adjustment to general market capitalization rate [was] appropriate
> * * * [and] supported by the fact that in order to obtain the debt capital for this
> project, the project owner must also secure government credit or credit support.
> That is not obtained without cost. The court finds it appropriate to view that cost
> as an additional cost of debt financing reflected in the mortgage component of the
> band-of-investment analysis."

/ / /

*Id.* at 160-61. The court in *Wilsonville Heights* was presented with sufficient evidence to support the plaintiff's base capitalization rate and upward adjustment. In this case, the court has not received sufficient evidence of either. As the court in *Wilsonville Heights* noted, "[s]mall changes in capitalization rate can make large differences in the ultimate indicated value." 17 OTR at 155. Here, the subject property's indicated real market value could be anything from $1.5 million to $2.3 million, depending on whether the capitalization rate is nine percent, 13.33 percent, or something in between. The court notes that the subject property's tax roll real market value was $2,118,120 for the 2013-14 tax year, which is within that range. The court concludes that Plaintiff has failed to prove by a preponderance of the evidence that the subject property's 2013-14 real market value should be reduced to $1,020,300. The court further concludes that the real market value evidence presented is inconclusive and the court is unable to determine the subject property's 2013-14 real market value under ORS 305.412.

### III. CONCLUSION

After careful consideration, the court concludes that Plaintiff has failed to prove by a preponderance of the evidence that the subject property's 2013-14 real market value should be reduced to $1,020,300. The court further concludes that the real market value evidence presented is inconclusive and the court is unable to determine the subject property's 2013-14 real market value under ORS 305.412. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of December 2014.


_____
ALLISON R. BOOMER
MAGISTRATE


*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on December 2, 2014. The court filed and entered this document on December 2, 2014.*